IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| PRATT CORRUGATED HOLDINGS, INC., a Delaware corporation, | : | |
| | : | |
| Counterclaim-Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO. |
| PORTER PIZZA BOX OF FLORIDA, INC., a Florida corporation, f/k/a STAR PIZZA BOX, and HALDEN PORTER | : | 1:18-cv-063-AT |
| | : | |
| Counterclaim-Defendants, | : | |
| | : | |

## Order

On November 15, 2023, the Court held a hearing with the parties in this action. (Doc. 235). The Court **GRANTED** Pratt Corrugated Holdings, Inc.'s Motion to Exclude Testimony, Evidence, and Argument Regarding Pratt's Other Lawsuits. (Doc. 225). Currently before the Court are Pratt's two other pending motions *in limine*. For the reasons stated below, the Court **GRANTS** Pratt's Motion to Exclude Testimony, Evidence, and Argument Regarding the Porter Parties' June 2023 Document Production, [Doc. 219], and **DENIES** Pratt's Motion to Exclude Testimony, Evidence, and Argument Regarding Attorney-Client Privileged Communications, [Doc. 224].

## I.   Pratt's Motion to Exclude the Porter Parties' June 2023 Document Production [Doc. 219]

### A. Background

In January 2023, the Court issued an Order providing a supplemental discovery period and setting trial for August 2023. (Doc. 159). Among other things, the Porter Parties were required to produce any additional documents relevant to damages by May 19, 2023. *See* (Doc. 178 at 2). On June 22, 2023 — more than a month after the deadline — the Porter Parties produced two sets of documents. They argue that the documents undermine Pratt's damages claim by showing that Pratt was unable to fulfill certain Porter Pizza orders during the contract period, requiring Porter Pizza to shift those orders to other suppliers — namely, International Paper ("IP") and Georgia Pacific ("GP").

On July 12, Pratt filed a Motion to Exclude the documents in the June 2023 production. (Doc. 195). After the August 8 pretrial conference, the Court denied Pratt's Motion without prejudice, rescheduled trial for November 2023, and ordered another supplementary discovery period to allow Pratt to obtain additional information regarding the creation and the production of these belatedly produced documents. (Doc. 213). At the conclusion of the supplemental discovery period, Pratt filed the instant Motion to Exclude, renewing its request that the Porter Parties be prohibited from referencing or presenting the two sets of documents composing the June 2023 production at trial. [Doc. 219].

The first set of documents, offered as Porter Parties' Trial Exhibit 176, are uncertified bank statements reflecting payments from Star Pizza Box of Georgia

LLC's bank account, as well as images of the checks used to make those payments. (Doc. 197-2). The Porter Parties represent that they received these records from Star Pizza's bank in approximately April 2023.[1] (*See* Grant Porter 10/4/2023 Dep., Doc. 221 at 35–36) (stating that "about six months ago," the bank emailed the documents to Porter Investment Holdings). Although the bank account statements do not themselves specify the recipients of the payments, Rhonda Reynolds (Star Pizza's former bookkeeper, and a current employee of Porter Investment Holdings) reviewed the statements and made handwritten notations identifying payments to Pratt, IP, and GP, and totaling the amounts paid. *See* (Defs.' Resp. Br., Doc. 223 at 3). She then "confirmed" the payments by comparing the transactions in the account ledgers to the check images included with each bank statement. (*Id.*). "Hal and Grant Porter then reviewed the statements to confirm Ms. Reynolds's math . . . ." (*Id.* at 3–4).

The second set of documents, offered as the Porter Parties' Trial Exhibit 175, are summary tables and bar charts purporting to summarize and illustrate the payment information contained in the annotated bank records. (Doc. 197-1). They were created by Grant Porter, who relied on Ms. Reynolds' calculations to construct the figures. (Defs.' Resp. Br., Doc. 223 at 4).

---

[1] Pratt notes that the documents in question are not a complete copy of the bank records that the Porter Parties obtained, and that the Porter Parties conceded after the close of supplemental discovery that they still have not provided Pratt with a complete copy of the bank statements. *See* (Pl.'s Reply Br., Doc. 228 at 7–9).

## B. Discussion

Pratt first argues that the documents and annotations are unauthenticated hearsay that should be excluded under Federal Rules of Evidence 803, 901, and 902. The Porter Parties respond that the bank records (Exhibit 176) are admissible as records kept in the ordinary course of business, because "Hal and Grant Porter have personal knowledge of the transactions reflected in the records," and because "Grant Porter testified that he did his own independent analysis regardless of Ms. Reynolds's notes." *See* (Defs.' Resp. Br., Doc. 223 at 7). They add, "should the Court have any concerns regarding the notes, Ms. Reynolds is a 'may call' witness for the Porter Parties and can personally attest to the notes, if needed." (*Id.*)

Pratt has the better argument. As the Court noted at the August 8 pretrial conference, the proffered bank records are not self-authenticating. (*See* 8/8/2023 Hearing Tr., Doc. 215 at 17). Despite this, the Porter Parties have not submitted qualified testimony or certification from the bank attesting to the authenticity of the records.[2] *See* Fed. R. Evid. 803(6); *see also* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). Nor have the Porter Parties provided an affidavit from Ms. Reynolds authenticating her annotations. *See* Fed. R. Evid. 901. Moreover, Exhibit 176 contains only a portion of the records the Porter Parties purportedly

---

[2] To the extent that the bank records are regularly kept business records, they are *the bank's* business records. Thus, testimony from Hal or Grant Porter is insufficient to authenticate them.

received from the bank, and they have not provided Pratt with a complete copy of the bank records. *See* (Defs.' Resp. Br., Doc. 223 at 5–6 & n.16; Pl.'s Reply Br., Doc. 228 at 7–9). Because the Porter Parties have not carried their burden to authenticate the documents contained in Exhibit 176, they are inadmissible.[3]

Because the Porter Parties' Exhibit 176 is inadmissible, so too is Exhibit 175. Although the Porter Parties contend that the summary tables and charts contained in Exhibit 175 are admissible under Federal Rule of Evidence 1006, the "essential requirement" for admissibility under that Rule is that the proffered chart or summary exhibit be supported by evidence *already admitted into* record. *See United States v. Melgen*, 967 F.3d 1250, 1260 (11th Cir. 2020) (citing *United States v. Richardson*, 233 F.3d 1285, 1293 (11th Cir. 2000)). Since the uncertified records that Exhibit 175 summarizes are inadmissible at this juncture, it may not be admitted under Rule 1006.

Pratt next argues that Exhibits 175 and 176 are more prejudicial than probative and should also be excluded under Federal Rule Evidence 403. It claims they lack probative value because: (1) the account statements and checks only reflect payments to three of Star Pizza's suppliers; (2) they do not contain information indicating why the payments were made; (3) they reflect *payments made* to the suppliers during the contract period, rather than *orders placed*; and

---

[3] If the Porter Parties wish to admit bank records into evidence at trial, they must present testimony or documentation from the bank certifying their authenticity or reach an agreement with Pratt that the authenticity of the documents is undisputed. And they must make a complete copy of the bank records available for Pratt to review.

(4) the Porter Parties offer only conjecture to support their claim that *all* of the identified payments to IP and GP were for orders that Pratt was unable to fulfill during the contract period. Pratt argues that because this recently created payment ledger cannot, on its own, show that Pratt was unable to meet Star Pizza's orders, offering the documents in question for that purpose would be unhelpful and likely to confuse the jury.

The Court agrees. Authentication issues aside, the problem with the Porter Party's position is that that the documents in question have limited probative value on their own. These generic bank records are not purchase orders. Although they are able to show that certain payments were made to certain vendors on certain dates, they shed no light on *why* those payments were made. And even assuming those payments were tied to Star Pizza's supply orders, the documents are unable to show *when* those orders were placed or *why* Star Pizza placed an order with a specific supplier at a certain moment in time. To show that, the Porter Parties would need to pair the documents in question with purchase orders and other documentation. However, they fail to do so.

The Porter Parties ignore these limitations, and contend that the documents "are probative and relevant because they show that the gross amount of product Porter Pizza *purchased* directly from Pratt declined significantly in the months immediately following the Agreement" while *purchases* from the other two suppliers "rose dramatically." (Defs.' Resp. Br., Doc. 223 at 8–9) (emphasis

added).[4] And they argue that the documents "*prove*[] that it was Pratt's supply problems . . . that prevented the parties from meeting [their contractual] quarterly requirement of $4.25 million of product," and "*show*[] that Porter Pizza purchased far more than $4.25 million of corrugated product during the agreement's first quarter." (*Id*. at 9) (emphasis added).

But, as previously discussed, the documents are not probative of any these conclusions because the account statements only reflect *payments* made during the covered time period. Although the Porter Parties explained during the November 15 pretrial conference that they planned on having Hal and Grant Porter testify as to why these documents support their position, no amount of testimony can change what the documents do and do not say. So while the Porter Parties are free to present testimony stating that Pratt was unable to fulfill its supply obligations under the parties' contract, they may not support such testimony by claiming that the documents say something that they do not.

Thus, the Porter Parties' request to present Exhibits 175 and 176 as evidence of *why* certain purchases were made or not made from certain suppliers during the contract period poses a substantial risk of misleading the jury and unfairly prejudicing Pratt. *See* Fed. R. Evid. 403.

For these reasons, Pratt's Motion to Exclude documents from the June 2023 Production, [Doc. 219], is **GRANTED**.

---

[4] Although the Porter Parties claim that this conclusion is "consistent with witness testimony and emails," they cite neither. *See* (Defs.' Resp. Br., Doc. 223 at 9).

## II.   Pratt's   Motion   to   Exclude   Attorney-Client   Privileged Communications [Doc. 224]

Pratt has also moved to exclude the Porter Parties' Trial Exhibit 112 and any related testimony, claiming that it constitutes privileged, inadvertently produced attorney-client communications.

During the 2019 discovery period, Pratt's prior counsel produced a 2016 email chain between Peg Fairbanks, a senior paralegal in Pratt's legal department, and Frank Adams, a sales director in Pratt's Southern Corrugating Division. Mr. Adams emailed Ms. Fairbanks at "contracts@prattindustries.com," stating that he was putting together a sales agreement with Star Pizza and needed her "quick review as well as some advice" regarding some of the language. *See* (2016 Email Chain between F. Adams and P. Fairbanks, Doc. 79-3 at 6). The ensuing email exchange discusses the drafting of the agreement, and one of Adams's primary purposes is clearly to seek legal advice. *See, e.g.,* (*id.* at 2) ("Here is the background and overall strategy so that you can make sure we are setup to execute it legally . . . ."); (*id.* at 3) ("I could use some help in validating my redneck wording into correctly interpreted legal language.").

First, the Porter Parties argue that the email exchange is not privileged because Ms. Fairbanks is not a lawyer and cannot provide legal advice. But as this Court previously explained, "Communications by non-attorneys are . . . protected by privilege if those non-attorneys are 'employed to assist the lawyer in the rendition of professional legal services.'" *United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1319, 1328 (N.D. Ga. 2015) (citation omitted); *see also*

8

*Molbogot v. MarineMax E., Inc.*, No. 20-CV-81254, 2021 WL 917984, at *2 (S.D. Fla. Mar. 10, 2021) (collecting cases) ("When a paralegal works on behalf of a lawyer who is representing a client, the attorney-client privilege applies to the paralegal."). And Pratt has provided an affidavit from Ms. Fairbanks, which states in part:

- The emails sent to the "contracts@prattindustries.com" email address "were not only visible to [her] but also to Pratt's General Counsel, Douglas R. Balyeat . . . so that he could monitor and supervise the communications and could either provide comments directly . . . or provide direction to [her] privately"; and

- Regarding the email exchange in question, she "coordinated with Mr. Balyeat and another licensed attorney in Pratt's Legal Department (T. Paul Nam)," to "provide[] legal assistance on behalf of the Pratt Legal Department acting under the direction of those attorneys."

(P. Fairbanks 10/20/2023 Dep., Doc. 224-1 at 4). Accordingly, the Court concludes that these communications fall comfortably within the attorney-client privilege.

Next, the Porter Parties argue that even if the emails are privileged, Pratt waived that privilege. This question is a closer call.

In May 2019, the Court entered a Stipulation and Consent Protection Order that was jointly filed by the parties. (Doc. 46). Paragraph 3 of the Protection Order states, in part, "Any inadvertent or mistaken production of Litigation Materials shall be without prejudice to any claim that such material is subject to the attorney-client privilege . . . or any other privilege or protection from disclosure, and shall not operate to waive such privilege or protection from disclosure." (*Id.* at ¶ 3).

The Porter Parties' acknowledge this portion of the Protective Order, but argue that it only protects *inadvertent or mistaken* productions of privileged documents, whereas the documents in question were *intentionally* produced. *See* (Defs.' Resp. Br., Doc. 226 at 2). In support, they note that Pratt was given notice that the emails had been produced when the Porter Parties cited them in their September 2019 summary judgment reply brief and Motion to Strike. *See* (*id.* at 3–4). But instead of raising an objection and clawing back the emails on privilege grounds, Pratt merely argued that the Porter Parties' citation of the emails was improper at summary judgment because they were introduced for the first time in a reply brief. *See* (Pl.'s Resp. to Defs.' Mtn. to Strike, Doc. 85 at 8 n.8). The Porter Parties contend Pratt's decision to not claw back the communications or invoke the attorney-client privilege over the next four years shows that the communications were either intentionally produced or that the privilege was waived.

Pratt responds by citing Georgia Rule of Professional Conduct 4.4(b), which requires a lawyer who receives a document that he "reasonably should know . . . was inadvertently sent" to "promptly notify the sender" of the disclosure so they may take protective measures. Pratt argues that rather than fulfill their obligations under the Rule, counsel for the Porter Parties remained silent until they cited the emails in their summary judgment reply brief. It notes that the Porter Parties' reply brief acknowledged that the emails were arguably privileged, but preemptively asserted that privilege did not apply. Pratt then cites a number of cases where courts have refused to find that privilege was waived where parties failed to comply

with their ethical obligation to notify opposing counsel that potentially privileged documents were disclosed. *See, e.g., AAMP of Fla., Inc. v. Auto. Data Sols., Inc.*, No. 8:13-CV-2019-T-35-TGW, 2015 WL 12844396, at *5 (M.D. Fla. May 21, 2015).

The Court agrees with Pratt that the Porter Parties handling of the documents in question was troubling. Had Pratt promptly raised an objection and clawed back the documents upon learning of their disclosure, the Court would have likely upheld their privileged status. But given that Pratt opted not to rectify the disclosure or invoke the privilege for four years, the Court must conclude that the privilege protecting the email chain contained in Exhibit 112 has been waived. *See* Fed. R. Civ. P. 502(b) (stating that an inadvertent disclosure does not operate as a waiver if, among other things, the holder of the privilege "promptly took reasonable steps to rectify the error").[5]

Thus, Pratt's Motion to Motion to Exclude Privileged Communications, [Doc. 224], is **DENIED.**

**IT IS SO ORDERED** this 17th day of November, 2023.

**Honorable Amy Totenberg**
**United States District Judge**

---

[5] The Court recognizes that Pratt's current counsel did not join the case until September 2022. But given that, by then, three years had passed since the disclosure of the emails was known, the horse was long out of the barn, and there was little that could be done to rectify Pratt's waiver. However, the Court emphasizes that scope of Pratt's waiver is quite narrow, and only encompasses the contents of the email chain in question.